**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

----------------------------------------------------------- x

DR. RAYNARD E. WASHINGTON, in
his official capacity as Commissioner of
the NEW JERSEY DEPARTMENT OF
HEALTH,

                 Plaintiff,

          - against -

THE GEO GROUP, INC.,

                Defendant.

----------------------------------------------------------- x

No. 2:26-cv-06466-JKS-LDW

**GEO'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR AN ORDER TO SHOW CAUSE**

**DAVIS WRIGHT TREMAINE LLP**
Geoffrey S. Brounell
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
Tel: (212) 489-8230
geoffreybrounell@dwt.com

*Attorneys for The GEO Group, Inc.*

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. BACKGROUND ...................................................................................5

    A. The Federal Government Controls Immigration Detention And Establishes National Uniform Standards ...............................................5

    B. The ICE Contract Awarded For The Delaney Hall Facility ................6

    C. The 2025 Politicization Of Delaney Hall............................................10

    D. The 2026 Politicization Of Delaney Hall............................................11

    E. ICE—Not GEO—Controls Access To Delaney Hall .........................13

III. ARGUMENT.......................................................................................14

    A. There Is No Article III Standing .........................................................15

    B. There Is No Likelihood Of Success On The Merits............................21

        1. There is no likelihood of success because the Complaint is subject to dismissal pursuant to Rule 12(b)(7) and Rule 19.....21

        2. There is no likelihood of success because GEO is immune .....24

        a. GEO is immune under *Yearsley*................................................25

        b. GEO is immune under the doctrine of intergovernmental immunity ..................................................................................26

            (1) Intergovernmental immunity—direct regulation............26

            (2) Intergovernmental immunity—impermissible discrimination ................................................................29

        3. There is no likelihood of success because federal immigration law preempts Plaintiff's attempt to enforce local health codes...................................................................30

        a. Field Preemption..................................................................31

i

        b.     Obstacle Preemption ...................................................................34

    C.     There Is No Irreparable Harm ...........................................................35

    D.     Granting A Preliminary Injunction Will Result In Harm To GEO
          And Will Not Serve The Public Interest In Enforcing
          Immigration Laws ..............................................................................38

IV.   CONCLUSION.......................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) ...............................................................37

*Arizona v. United States*,
   567 U.S. 387 (2012)..............................................................23, 33, 34

*Autobar v. Berg Liquor*,
   No. 23cv3790 (MAS) (JBD), 2024 WL 919183 (D.N.J. Mar. 4, 2024) ............22

*Bhd. of R. R. Trainmen v. Balt. & O. R. Co.*,
   331 U.S. 519 (1947)...............................................................24

*Boat Basin Invs., LLC v. First Am. Stock Transfer, Inc.*,
   No. 03cv493 (RWS), 2003 WL 282144 (S.D.N.Y. Feb. 7, 2003) .....................24

*Boeing Co. v. Movassaghi*,
   768 F.3d 832 (9th Cir. 2014) ...............................................................28

*Brennan v. William Paterson Coll.*,
   492 F. App'x 258 (3d Cir. 2012) ...............................................................15

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016)...............................................................25

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995) ...............................................................36

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983)...............................................................16

*City of Newark v. GEO Re-Entry Group, LLC et al.*,
   Case No. 2:25-cv-02225-JKS-LDW...............................................................11

*CoreCivic, Inc. v. Governor of N.J.*,
   145 F.4th 315 (3d Cir. 2025) ...............................................................28

*Def. Distrib. v. Att'y Gen. of N.J.*,
   167 F.4th 65 (3d Cir. 2026) ...............................................................16

*Del. River Port Auth. v. Transam. Trailer Transp., Inc.*,
    501 F.2d 917 (3d Cir. 1974) ...............................................................................38

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. 100 (2025)..........................................................................................17

*Doe v. Christie*,
    33 F. Supp. 3d 518 (D.N.J. 2014), *aff'd sub nom. Doe v. Governor of N.J.*, 783
    F.3d 150 (3d Cir. 2015) ......................................................................................22

*Gartrell Construction Inc. v. Aubry*,
    940 F.2d 437 (9th Cir. 1991) .......................................................................32, 33

*GEO Grp., Inc. v. Menocal*,
    607 U.S. ---, 146 S. Ct. 774 (2026).....................................................................25

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824)................................................................................34

*Hencely v. Fluor*,
    608 U.S. ---, 146 S. Ct. 1086 (2026)..............................................................25, 26

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)................................................................................5, 23, 34

*Kurelko v. Att'y Gen.*,
    No. 25cv2041 (ZNQ (JBD), 2025 WL 2237495 (D.N.J. Aug. 6, 2025)............21

*Lependorf v. Sup. Ct.*,
    No. 25cv2154 (RK) (TJB), 2026 WL 251893 (D.N.J. Jan. 30, 2026) ...............21

*Leslie Miller, Inc. v. Arkansas*,
    352 U.S. 187 (1956)................................................................................27, 28, 32

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................16

*Lutter v. JNESO*,
    86 F.4th 111 (3d Cir. 2023) .........................................................................16, 17

*M'Culloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ......................................................................26, 27

*Mallet & Co. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) ...................................................................15

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)..............................................................................16

*Messina v. Coll. of N.J.*,
    566 F. Supp. 3d 236 (D.N.J. 2021)........................................................36

*Murphy v. NCAA*,
    584 U.S. 453 (2018)..............................................................................35

*Murthy v. Missouri*,
    603 U.S. 43 (2024)................................................................................21

*North Dakota v. United States*,
    495 U.S. 423 (1990)..............................................................................29

*Novartis v. J&J*,
    290 F.3d 578 (3d Cir. 2002) .................................................................14

*Nwauzor v. GEO Grp., Inc.*,
    127 F.4th 750 (9th Cir. 2025) ...............................................................28

*Osborn v. Bank of United States*,
    22 U.S. (9 Wheat.) 738 (1824) .............................................................27

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*,
    913 F.2d 64 (3d Cir. 1990) ...................................................................17

*Raines v. Byrd*,
    521 U.S. 811 (1997)..............................................................................16

*Ram v. Lal*,
    906 F. Supp. 2d 59 (E.D.N.Y. 2012) .....................................................24

*Reading v. N. Hanover*,
    124 F.4th 189 (3d Cir. 2024) ................................................................21

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ...........................................................15, 38

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)....................................................................................33

*Rosenzweig v. Brunswick Corp.*,
  No. 08–807 (SDW), 2008 WL 3895485 (D.N.J. Aug. 20, 2008)......................23

*Ry. Mail Ass'n v. Corsi*,
  326 U.S. 88 (1945)..............................................................................27, 28

*Short v. N.J. Dep't of Educ.*,
  No. 23cv21105 (ESK) (EAP), 2025 WL 984730 (D.N.J. Mar. 28, 2025).........21

*Sorenson v. Selective Serv. Sys.*,
  203 F. Supp. 786 (E.D. Pa. 1962).................................................................22

*State of New Jersey v. The Geo Group, Inc.*,
  Case No. 2:25-cv-12007-JKS-LDW.................................................................11

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)....................................................................................17

*Taliaferro v. Darby Twp. Zoning Bd.*,
  458 F.3d 181 (3d Cir. 2006) .......................................................................15

*Tanko v. Moore*,
  2023 WL 3033573 (D.N.J. Apr. 21, 2023).....................................................35

*Tarek Holdings, LLC v. Shockley*,
  No. 21-20581(SDW)(AME), 2022 WL 13848153 (D.N.J. Oct. 24, 2022)........23

*Toll Bros. v. Twp. of Readington*,
  555 F.3d 131 (3d Cir. 2009) .......................................................................17

*Trump v. Hawaii*,
  585 U.S. 667 (2018).....................................................................................5

*United States v. California*,
  173 F.4th 1060 (9th Cir. 2026) ...................................................................28

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) .................................................................34, 35

vi

*United States v. Washington*,
   596 U.S. 832 (2022)....................................................................................29, 30

*Warner Lambert Co. v. McCrory's Corp.*,
   718 F. Supp. 389 (D.N.J. 1989)........................................................................38

*Washington v. United States*,
   460 U.S. 536 (1983)...........................................................................................29

*Westchester Disabled On the Move, Inc. v. County of Westchester*,
   346 F. Supp. 2d 473 (S.D.N.Y. 2004) ...............................................................24

*Yearsley v. W.A. Ross Construction Co.*,
   309 U.S. 18 (1940)........................................................................................25, 26

## State Statutes

6 U.S.C.
   § 112.............................................................................................................23, 31
   § 205......................................................................................................31, 32, 35
   § 251...................................................................................................................5
   § 252...................................................................................................................5

8 U.S.C.
   § 1225.................................................................................................................5
   § 1226...........................................................................................................5, 23
   § 1231..................................................................................................5, 6, 26, 31

18 U.S.C. § 4013 .............................................................................................................31

28 U.S.C. § 530C ...............................................................................................23, 26, 31

FY2024 Appropriations Act, div. C, Title V, Pub. L. No. 118-47, 138 Stat. 460,
   619 (Mar. 23, 2024) ....................................................................................19, 26

FY2025 Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4,
   139 Stat. 9, 27 (March 15, 2025) .......................................................................39

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25,
   2002) ...................................................................................................................5

N.J. Stat. Ann. 26:1A-16....................................................................................................36

N.J. Stat. Ann. 26:1A-18.................................................................................36

Pub. L. No. 106-553,  119, 114 Stat. 2762A-52 (2000), codified at 18 U.S.C.
    4013 note.......................................................................................31

## Rules

Fed. R. Civ. P.
    12..............................................................................................*passim*
    19.................................................................................3, 22, 23, 24

## Regulations

8 C.F.R. § 235.3(e)........................................................................................6

48 C.F.R.
    § 9.104-1 ...................................................................................33
    § 15.204-2(c)..............................................................................9
    § 52.212-4 ...............................................................................1, 8
    § 52.212-4(q).............................................................................9
    § 52.212-4(s).............................................................................9

## Constitutional Provisions

U.S. Const. Article I § 8 Cl. 4.......................................................................25

U.S. Const. Article III .................................................................................2

U.S. Const. Article III § 2 ...........................................................................16

U.S. Const. Article VI cl. 2 .........................................................................26

## Other Authorities

Devon Williams and Miniya Malone, *Sherrill calls for the shutdown of the
    Delaney Hall immigrant detention center,* TRENTON JOURNAL (June 4, 2026),
    https://tinyurl.com/mrbkdp22 ...............................................13, 39

Eric Kiefer, *ICE Detention Center In NJ Is First To Open Under Trump's New
    Term*, PATCH.COM (Feb. 27, 2025, 12:30 PM, *updated* 10:20 PM),
    https://tinyurl.com/5h8bvz2k...............................................................10

The GEO Grp., Inc., *The GEO Group Awarded 15-Year Contract by U.S. Immigration and Customs Enforcement for Company-Owned, 1,000-Bed Delaney Hall Facility in New Jersey* (Feb. 27, 2025), https://tinyurl.com/2rkb5pdk ...................................................................................6

Jeff Goldman, *Gov. Sherrill finally gets her Delaney Hall tour — and leaves with even more questions*, NJ.COM (June 8, 2026), https://tinyurl.com/4bmx66vb...............................................................................14

Jelani Gibson, S.P. Sullivan & Brent Johnson, *A hunger strike, protests and a pepper-sprayed U.S. senator: Inside a violent holiday weekend at N.J.'s private ICE jail*, NJ.COM (updated June 1, 2026), https://tinyurl.com/4vfnabem ........12

Katherine Donlevy, Geoff Earle & Gabrielle Fahmy, *Anti-ICE protesters pooling cash for riot gear, military-grade goggles to fuel Newark mayhem*, N.Y. POST (May 30, 2026).....................................................................................13

Nicole Zanchelli, *Delaney Hall 'Has No Real Grounds to Be Open,' Newark Mayor Says, As New Jersey Sues Detention Center Operators for Access*, TAPINTO NEWARK (June 2, 2026), https://tinyurl.com/yfeaf5tb.......................................12

President Donald J. Trump, *Protecting the American People Against Invasion* (Jan. 20, 2025), https://tinyurl.com/yauyxxks...........................................................39

Press Release, N.J. Gov. Mikie Sherrill, Statement by Governor Sherrill on Delaney Hall (May 24, 2026), https://tinyurl.com/35vbhfwf.............................14

Richard Khavkine, *Feds plan to more than double immigrant detainees in Essex*, STAR LEDGER (June 10, 2011) ..................................................................10

Scott Fallon & Eduardo Cuevas, *New Jersey sues over controversial Delaney Hall ICE detention center*, USA TODAY (updated June 3, 2026), https://tinyurl.com/a3hdnt4d...............................................................................12

Secretary Markwayne Mullin (@SecMullinDHS), X (June 8, 2026, at 10:11 PM), https://tinyurl.com/m3p2xm58 ......................................................................14

Sophie Nieto-Munoz, *Gov. Sherrill implements protest zones to 'cool things down' at Newark detention center*, N.J. MONITOR (May 29, 2026), https://tinyurl.com/5n98wsr3................................................................12, 13, 39

Steve Strunsky, *'We are all immigrants': Newark rallies against massive new ICE detention center*, NJ.COM (Mar. 11, 2025 7:45 PM, *updated* Mar. 13, 2025 7:57 AM), https://tinyurl.com/mr29pr94 .......................................................10, 11

Tom Martello, *The left is fuming over Mikie Sherrill. Why it's already make or break for N.J.'s new gov.*, NJ.COM (updated June 3, 2026), https://tinyurl.com/5dyucn3d ...............................................................................12

U.S. Customs & Immigr. Enf't, *ICE expands detention capacity with Delaney Hall Facility in New Jersey* (Feb. 26, 2025), https://tinyurl.com/m5r5bf3t .................6

x

Defendant The GEO Group, Inc. ("GEO") respectfully submits this memorandum of law in response to Plaintiff's motion for an order to show cause.

## I.    INTRODUCTION

This motion fails on every prong of the analysis required to grant emergency injunctive relief. But underlying these defects is one indisputable fact, which requires no complicated legal argument to understand: ICE—not GEO—controls access to Delaney Hall. Plaintiff cannot wish this fact away by suing only GEO.

Both Plaintiff and the Court quote language that GEO "shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance" under the agreement. GEO's position has always been—and remains—that it is in compliance with this language. But to be clear: the quotation is taken verbatim from general language required by all commercial item contracts, Federal Acquisition Regulation (FAR) 52.212-4. That same provision also states that a specific contract setting forth the statement of work between the parties—here, the governing Performance Work Statement (part of the "ICE Contract")—takes precedence. And the ICE Contract has always unambiguously stated that ICE controls access to Delaney Hall. The current (and controlling) version of the ICE Contract, as amended June 10, 2026, could not be more explicit

1

on this point.[1]  "Pre-clearance approval from ICE/ERO is required for any person or entity to have access to ICE field staff, facilities, and information, including any proposed law enforcement officer visits."  "If any conflicts between federal, state, or law laws or rules arise, the federal rules shall be followed."  New Jersey is not a party to the ICE Contract and has not asserted any theory by which it could enforce this contract's language as a third party.  But even if the Court were to entertain such a challenge, it would fail.  The contract plainly states that ICE—not GEO, and certainly not the state of New Jersey—controls access to Delaney Hall.  And that language governs.

The factual record is similarly straightforward (and undisputed) on this point.  All attempts to access Delaney Hall have always been granted or denied by ICE— not GEO—without exception.  Indeed, ICE granted and denied Plaintiff's efforts to access Delaney Hall *in this very case*, a fact tweeted about by Governor Mikie Sherrill.  Still the State decided to sue GEO rather than ICE in this lawsuit.

As a result, and most fundamentally, Plaintiff's motion fails because its claim against GEO lacks Article III standing.  Article III of the U.S. Constitution requires a plaintiff to demonstrate (1) an injury that is (2) not only traceable to the challenged conduct of the defendant but also (3) likely to be redressed by a favorable judicial

---

[1] GEO is working with ICE to make the necessary redactions and will submit a copy of the June 10, 2026 contract modifications to the Court as soon as that process is complete.

decision. Here, the alleged injury is the denial of access to Delaney Hall to conduct certain inspections. But because GEO did not deny access—ICE did—the injury is not traceable to any conduct by GEO. And for essentially the same reason, an injunction against GEO will not redress the alleged injury. Only an injunction against ICE can grant that relief. This Court is therefore without subject matter jurisdiction to even hear this emergency application. This is a threshold failure that, by itself, warrants summary denial of the motion. In fact, it merits dismissal of the entire lawsuit, for the reasons set forth in GEO's motion to dismiss papers.

If the Court were to consider the merits—although for the reason just stated, it lacks the jurisdiction to do so—the motion also fails on every prong of the traditional preliminary injunction analysis. First, there is no likelihood of success on the merits. It is black-letter law that a request for a preliminary injunction must be denied when a complaint is subject to dismissal under Rule 12. As set forth in GEO's motion for dismissal, this case must be dismissed because ICE (as the only party that can grant the relief requested) is a necessary party to this action under Rule 19 and Rule 12(b)(7). There is also no likelihood of success on the merits for two additional reasons: because (1) GEO is immune under the doctrines of *Yearsley* defense and intergovernmental immunity and (2) federal law preempts a state's attempts to thwart the enforcement of this country's immigration laws. Either provides an additional and separate ground to deny the motion.

Second, there is no irreparable harm. This lawsuit is about obtaining access to Delaney Hall. Only ICE can grant that access. Consequently, there is no irreparable harm because the issue about which Plaintiff complains is both immediately reparable—it can request permission from ICE—and self-inflicted, in that Plaintiff has improperly sought relief in this lawsuit from a party that does not control access to the facility. And while the Complaint cites to a litany of hearsay statements from media and politicians complaining about Delaney Hall, it fails to mention that the one inspection Plaintiff recently conducted on May 28, 2026, resulted in a "satisfactory" assessment. Plaintiff has not identified a single case—and undersigned counsel remains unaware of any—in which a New Jersey court has granted a preliminary injunction for hearsay allegations about purported code violations for inspections that have not yet taken place (especially here, when the one inspection that did occur should dispel any alarm).

Turning to the harm and public interest: this motion appears to be the latest in a series of politically-motivated attempts to interfere with the operations of federal immigration enforcement in New Jersey. First it was the passage of AB 5207, which purported to outlaw federal immigration detention operation in New Jersey before being struck down by the Third Circuit. Next it was Newark Mayor Ras Baraka—at the time, unsuccessfully attempting to run for governor—proclaiming that "[r]egardless of the process, an immigrant detention center is not welcomed here." Now it is Governor Sherrill declaring: "I don't think private detention centers should

be operating in New Jersey" and that "I'd like to see it shut down."  It was not—and is not—in the public's interest to allow this to proceed.  To hold otherwise would be to prioritize local partisan politics over the public's overwhelming interest in the enforcement of this country's immigration laws.

## II.    BACKGROUND

### A.    The Federal Government Controls Immigration Detention And Establishes National Uniform Standards

The courts have long considered the federal government's authority over immigration as a "fundamental sovereign attribute[.]"  *Trump v. Hawaii*, 585 U.S. 667, 702 (2018).  This stems, at least in part, from the intertwined nature of immigration and foreign policy.  *See Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).

In exercising its authority over immigration, Congress created the Department of Homeland Security.  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  Congress tasked DHS with the detention and removal program for individuals unlawfully present in the United States.  6 U.S.C. § 251(1) & (2).  Congress created ICE as DHS's law enforcement body and directed the Assistant Secretary of ICE to "establish the policies for performing" the "functions" transferred to ICE and to "oversee the administration of such policies."  6 U.S.C. § 252(a)(3)(A) & (B).  ICE's Enforcement and Removal Operations (ERO) executes Congress's mandate that certain individuals be detained during removal proceedings or pending their removal.  *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A),

1226(c)(1), 1231(a)(2).  Congress granted the Secretary of Homeland Security broad authority to identify "appropriate" facilities for detention, 8 U.S.C. § 1231(g)(1), and required DHS to favor using existing detention centers before initiating new construction, 8 U.S.C. § 1231(g)(2).

DHS promulgated regulations that identify criteria for public or private providers of detention services.  The primary requirement is that the provider "perform[] such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities."  8 C.F.R. § 235.3(e).

**B.    The ICE Contract Awarded For The Delaney Hall Facility**

In accordance with this requirement, on February 27, 2025, ICE awarded a 15-year, fixed-price contract to GEO for secure residential support services and the exclusive use of Delaney Hall for the establishment of a federal immigration processing center in Newark, New Jersey.  U.S. Customs & Immigr. Enf't, *ICE expands detention capacity with Delaney Hall Facility in New Jersey* (Feb. 26, 2025), https://tinyurl.com/m5r5bf3t; The GEO Grp., Inc., *The GEO Group Awarded 15-Year Contract by U.S. Immigration and Customs Enforcement for Company-Owned, 1,000-Bed Delaney Hall Facility in New Jersey* (Feb. 27, 2025), https://tinyurl.com/2rkb5pdk.

The ICE Contract was most recently amended on June 10, 2026.  Ragsdale Decl. ¶ 5.  It contains unambiguous language that grants ICE exclusive use of the Delaney Hall Facility and provides that ICE exercise exclusive control over all

6

access to secure portions of the facility.  *Id.* ¶ 4.  As a result, all requests for access to the secure portions of the Delaney Hall Facility must obtain pre-clearance approvals by ICE.  Grimes Decl. ¶ 6.

To start, Section 1.1 of the ICE Contract plainly states that "ICE is responsible for the detention, health, welfare, transportation, and deportation of aliens in removal proceedings, and those subject to a final order of removal from the U.S."  Ragsdale Decl. ¶ 5 (ICE Contract § 1.1).  The ICE Contract then unambiguously outlines the specific procedures for all requests for access to Delaney Hall:

> **Pre-clearance approval from ICE/ERO is required for any person or entity to have access to ICE field staff, facilities and information, including any proposed law enforcement officer visits**. All requests must be submitted in accordance with the requirements found at www.ice.gov/leadership/ocr. At facilities that house detainees for both ICE and the U.S. Marshals Service, inquiries regarding each agencies detainees will be directed to agency responsible for the detainee.
>
> All requests by NGOs and other stakeholders (which include, but are not limited to, intergovernmental entities, state and local governmental agencies, and members of academia, for tours or visits (including combined tour-and-visits events) must be submitted in writing to the local ICE/ERO Field Office. Tour requests should not be directed to the federal facility.
>
> Any such requests received by the federal facility shall be forwarded to the Field Office for review. When deciding whether to approve or deny the request, the Field Office Director, or his or her designee, will take into consideration safety and security, and the availability of personnel to staff the tour or visit. All tour or visit participants will be expected to submit personal information required by applicable ICE policies, so the Field Office can perform background checks as necessary.

Ragsdale Decl. ¶ 5 (ICE Contract § 1.16.16) (emphasis added).

Building on the above, multiple provisions of the ICE Contract repeatedly affirm that ICE—not GEO, and certainly not the State of New Jersey—controls access to Delaney Hall.  The below chart summarizes these provisions:

| Contract Section | Quote | Citation |
|---|---|---|
| § 1.2: **Scope of Work** | "Detention standards shall be performed in accordance with the most current version of the ICE National Detention Standards (NDS) 2026."[2] | Ragsdale Decl. ¶ 5 (ICE Contract § 1.2) |
| § 1.15:8: **Visitation** | All visitations and tours to Delaney Hall "shall be conducted in accordance with the relevant provisions of NDS 2026 or as directed by ICE." | Ragsdale Decl. ¶ 5 (ICE Contract § 1.15:8) |
| § 1.16.1: **Security and Control (General)** | GEO "shall comply with ICE security plans." | Ragsdale Decl. ¶ 5 (ICE Contract § 1.16.1) |
| § 1.16.3: **Unauthorized Access** | GEO "shall detect and detain persons attempting to gain unauthorized access." | Ragsdale Decl. ¶ 5 (ICE Contract § 1.16.3) |
| § 1.21.1.2: **Preliminary Fitness Determination** | ICE "exercise[s] full control over granting, denying, withholding or terminating unescorted government facility . . . access for [GEO] applicants/employees." | Ragsdale Decl. ¶ 5 (ICE Contract § 1.21.1.2) |

As both Plaintiff in its motion papers, *see* ECF No. 1-1 ("Compl.")—and this Court in its text order, *see* ECF No. 3—have pointed out, the ICE Contract incorporates by reference the entirety of the language contained in FAR clause

---

[2] The governing NDS 2026, which will be made publicly available shortly, confirms the principles expressed in the ICE Contract—namely, ICE (not GEO) controls access to facilities like Delaney Hall.

52.212-4, which states that all contractors "shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance" under any commercial item contract. *See* 48 C.F.R. § 52.212-4(q) (2024). Significantly, however, FAR clause 52.212-4(s) proceeds to state that "[a]ny inconsistencies in this solicitation or contract shall be resolved by giving precedence" to "[t]he schedule of supplies/services" over "[o]ther [c]ompliances . . . of this clause." *Id*. at § 52.212-4(s). The language regarding ICE controlling access to Delaney Hall can be found in the Performance Work Statement ("PWS") part of the ICE Contract. Because the PWS falls within the definition of "schedule" under the express terms of this provision, the language in that agreement takes "precedence" over the"[o]ther [c]ompliances . . . of this clause," i.e., the quoted language in subclause (q) relied upon by Plaintiff. *See* 48 C.F.R. § 15.204-2(c) (2024) (denoting "schedule" to include "Description," "specifications, and a "statement of work").

The PWS also makes explicit that federal laws or rules govern to the extent there is any conflict with state or local laws or rules:

> **If any conflicts between federal, state, or local laws or rules arise, the federal rules shall be followed**. Nothing in this performance work statement is intended to, or shall be construed to be, a waiver of federal supremacy or the immunity of the Government or its support-service provider, the contractor. **Otherwise, applicable or more stringent state or local laws or regulations shall not apply to the performance under this contract when they would directly or indirectly regulate, dictate, or control the support-service provider's performance under these standards**.

9

Ragsdale Decl. ¶ 5 (ICE Contract § 1.2) (emphasis added).

## C.    The 2025 Politicization Of Delaney Hall

GEO previously operated Delaney Hall as an immigration detention center for many years without incident.  Starting in 2011, GEO operated Delaney Hall under the supervision of President Obama's Department of Homeland Security.  Grimes Decl. ¶ 3; *see* Richard Khavkine, *Feds plan to more than double immigrant detainees in Essex*, STAR LEDGER (June 10, 2011).  During this time, neither the State of New Jersey nor any New Jersey governmental entity in New Jersey sued GEO in connection with inspections or any other issues at Delaney Hall.  Grimes Decl. ¶ 8.

That changed when President Trump was reelected to a second term on November 5, 2024.  New Jersey elected officials suddenly vowed to "fight like hell" and "fight to the death" against Delaney Hall—despite raising no such alarms about the operation of this center during the Obama administration.  Grimes Decl. ¶ 8; *see, e.g.*, Eric Kiefer, *ICE Detention Center In NJ Is First To Open Under Trump's New Term*, PATCH.COM (Feb. 27, 2025, 12:30 PM, *updated* 10:20 PM), https://tinyurl.com/5h8bvz2k.  Newark Mayor Ras Baraka, during his unsuccessful campaign for New Jersey governor, vowed to block federal immigration detention at the Delaney Hall Facility and padlock the building if necessary.  *See* Steve Strunsky, *'We are all immigrants': Newark rallies against massive new ICE*

10

*detention center*, NJ.COM (Mar. 11, 2025 7:45 PM, *updated* Mar. 13, 2025 7:57 AM), https://tinyurl.com/mr29pr94.

The 2025 politicization of Delaney Hall resulted in multiple lawsuits, including two pending before this Court: *City of Newark v. GEO Re-Entry Group, LLC et al.*, Case No. 2:25-cv-02225-JKS-LDW and *State of New Jersey v. The Geo Group, Inc.*, Case No. 2:25-cv-12007-JKS-LDW. The Court is well aware of the procedural history of these cases. But there are two indisputable conclusions from these lawsuits relevant to this case. First, Newark repeatedly obtained access to Delaney Hall to conduct inspections by requesting permission through ICE—not GEO. *See City of Newark* (ECF No. 2 ¶¶ 4–10; ECF No. 9-1 at 3; ECF No. 35 at 2). Second, and notwithstanding all of the political noise to the contrary, the inspections resulted in no significant outstanding concerns—Newark has admitted *on the record* that it conducted all of its requested inspections and thereafter voluntarily withdrew its motion for emergency relief. *See id.* ECF No. 57.

**D.    The 2026 Politicization Of Delaney Hall**

In fact, from June 2025 to May 2026, there were no complaints about any New Jersey state or local agency failing to obtain access to Delaney Hall to conduct inspections. That—again—changed in late May 2026, when political protests erupted outside of Delaney Hall. Scott Fallon & Eduardo Cuevas, *New Jersey sues over controversial Delaney Hall ICE detention center*, USA TODAY (updated June 3, 2026), https://tinyurl.com/a3hdnt4d. Although Governor Mikie Sherrill initially

joined the protestors over the Memorial Day weekend, by Friday, May 29, 2026, she ordered New Jersey State Police to create peaceful assembly zones outside Delaney Hall in an attempt to keep the peace.  Sophie Nieto-Munoz, *Gov. Sherrill implements protest zones to 'cool things down' at Newark detention center*, N.J. MONITOR (May 29, 2026), https://tinyurl.com/5n98wsr3.  As Governor Sherril explained, "national extremist groups have become involved in the protest" and multiple people from outside the State of New Jersey were arrested.  Katherine Donlevy, Geoff Earle & Gabrielle Fahmy, *Anti-ICE protesters pooling cash for riot gear, military-grade goggles to fuel Newark mayhem*, N.Y. POST (May 30, 2026), https://tinyurl.com/2ndk4rec.  Governor Sherrill has since faced criticism for this decision "from advocacy groups and progressive organizations."  Nicole Zanchelli, *Delaney Hall 'Has No Real Grounds to Be Open,' Newark Mayor Says, As New Jersey Sues Detention Center Operators for Access*, TAPINTO NEWARK (June 2, 2026), https://tinyurl.com/yfeaf5tb; *see also, e.g.*, Tom Martello, *The left is fuming over Mikie Sherrill. Why it's already make or break for N.J.'s new gov.*, NJ.COM (updated June 3, 2026), https://tinyurl.com/5dyucn3d.  This lawsuit followed.

As with the 2025 politicization of Delaney Hall, multiple New Jersey governmental officials have unambiguously announced their goals to the press:  they want to shut down Delaney Hall, one way or another, regardless of the facts or process.  For example, Governor Sherrill spoke to the press on May 29, 2026, stating she would "keep pushing to see Delaney Hall close."  Nieto-Munoz, *Gov. Sherrill*

*implements protest zones*, *supra*; *see also* Jelani Gibson, S.P. Sullivan & Brent Johnson, *A hunger strike, protests and a pepper-sprayed U.S. senator: Inside a violent holiday weekend at N.J.'s private ICE jail*, NJ.COM (updated June 1, 2026), https://tinyurl.com/4vfnabem (reporting that Gov. Sherrill, U.S. Sen. Andy Kim, and other Democratic members of New Jersey's congressional delegation "want the detention center shut down"). Governor Mikie Sherrill recently put it as bluntly as possible: "I don't think private detention centers should be operating in New Jersey" and that "I'd like to see it shut down." Devon Williams and Miniya Malone, *Sherrill calls for the shutdown of the Delaney Hall immigrant detention center*, TRENTON JOURNAL (June 4, 2026), https://tinyurl.com/mrbkdp22.

E.    **ICE—Not GEO—Controls Access To Delaney Hall**

Requests for access to secure portions of Delaney Hall have always been subject to ICE approval. Grimes Decl. ¶ 12. For example, between January 1, 2026 and June 2, 2026, there were seventeen separate visits to Delaney Hall by various politicians. *Id.* Each visit was approved by ICE. As a matter of fact, ICE controls access to Delaney Hall. *Id.*

Consistent with this authority, ICE—not GEO—has also been responsible for granting and denying Plaintiff's access to Delaney Hall relevant to this lawsuit. Specifically, on May 28, 2026, ICE granted Plaintiff permission to conduct an inspection of the kitchen at Delaney Hall. *See* Grimes Decl. ¶ 10 Ex. B. The New Jersey Department of Health issued a Retail Food Inspection Report based on this

13

inspection, which states that "[o]verall sanitation and physical condition of the production kitchen and warehousing areas were observed to be satisfactory and free from signs of rodent or vermin activity[.]" Grimes Decl. ¶ 9 Ex. A. The report also notes that the [l]ast local health department inspection was conducted on 4/25/25 which was rated satisfactory." *Id*. Later, on May 29, 2026, ICE—not GEO—denied access to several officials from New Jersey Department of Health, including the inspector who visited on May 28, 2026. Grimes Decl. ¶ 11 Ex. C.

Indeed, as Governor Mikie Sherrill herself explained in a press release pre-dating this lawsuit: "I have contacted ICE to gain access to the facility." Press Release, N.J. Gov. Mikie Sherrill, Statement by Governor Sherrill on Delaney Hall (May 24, 2026), https://tinyurl.com/35vbhfwf. And on June 8, 2026, ICE (not GEO) granted Governor Sherrill access to tour Delaney Hall. *See* Secretary Markwayne Mullin (@SecMullinDHS), X (June 8, 2026, at 10:11 PM), https://tinyurl.com/m3p2xm58; Jeff Goldman, *Gov. Sherrill finally gets her Delaney Hall tour — and leaves with even more questions*, NJ.COM (June 8, 2026), https://tinyurl.com/4bmx66vb.

### III.   ARGUMENT

In the Third Circuit, preliminary injunctive relief is "an extraordinary remedy, which should be granted only in limited circumstances." *Novartis v. J&J*, 290 F.3d 578, 586 (3d Cir. 2002) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)). Requests for preliminary injunctive relief are

14

evaluated under a well-established four-factor test under which the court first considers whether the party seeking preliminary injunctive relief has demonstrated (1) a likelihood of success on the merits; and (2) that it will suffer irreparable harm absent such injunctive relief. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). Only if the moving party establishes both of these threshold factors does the court go on to consider the balancing of equities, including (3) whether granting preliminary injunctive relief will harm the nonmoving party or other interested persons; and (4) the public interest. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017). The Court must then determine, in its sound discretion, whether the balance of these factors weighs in favor of granting the requested preliminary injunctive relief. *Id.*

## A.    There Is No Article III Standing

In this case, the Court is not permitted to even reach this traditional test for injunctive relief because Plaintiff lacks Article III standing. It is black-letter law that "[a] plaintiff must have Article III standing to seek a preliminary injunction." *Brennan v. William Paterson Coll.*, 492 F. App'x 258, 262 (3d Cir. 2012). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). This principle applies with equal force in the context of denying motions for emergency injunctive relief. *See, e.g.,*

15

*Def. Distrib. v. Att'y Gen. of N.J.*, 167 F.4th 65, 76–77 (3d Cir. 2026) (affirming dismissal of request for injunctive relief because of lack of standing).

Article III of the United States Constitution limits the jurisdiction of federal courts to the resolution of "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2; *see City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983). One aspect of this case-or-controversy requirement is that the party invoking the jurisdiction of the federal judiciary establish "standing" to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Standing consists of three "irreducible" constitutional elements: (1) an "injury in fact"; (2) "a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) a showing that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). As the movant, Plaintiff must establish each element by a "*clear showing*" because a preliminary injunction is "an extraordinary and drastic remedy[.]" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller's Federal Practice & Procedure § 2948, at 129–30 (2d ed. 1995)).

In this case, Plaintiff is unable to meet its burden in establishing both the second and third elements: traceability and redressability. Traceability mandates that the alleged injury cannot result from "independent action of some third party not before the court." *Lutter v. JNESO*, 86 F.4th 111, 127 (3d Cir. 2023) (citations

16

omitted); *see also, e.g.*, *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("The plaintiff must establish that the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury."). The redressability requirement is "closely related" to the traceability element. *Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990). "While the fairly traceable element focuses on the connection between the defendant's conduct and the plaintiff's injury, the redressability factor focuses on the connection between the plaintiff's injury and the judicial relief sought." *Id.* As such, redressability requires the Plaintiff to "'show a predictable chain of events' that would likely result from judicial relief and redress [its] injury." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 121 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024)). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). It is not enough that Plaintiff dislikes GEO or is frustrated by ICE's approval process. *See id*. ("[P]sychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury[.]").

Here, Plaintiff requests an order enjoining GEO from "[b]arring Plaintiff and the New Jersey Department of Health from full access to the immigration detention center known as Delaney Hall . . . to conduct an inspection." Compl. at 20. This injury is neither traceable to GEO's conduct nor redressable by any order issued

17

against GEO because ICE—a party not before this Court—controls access to Delaney Hall. ICE not only has exclusive use of the Delaney Hall Facility but also exercises exclusive control over all access to secure portions of the facility. Grimes Decl. ¶ 5. As a result, all requests for access to the secure portions of the Delaney Hall Facility must obtain pre-clearance approvals by ICE. *Id.* ¶ 6.

Indeed, while Plaintiff's own pleading attempts to dance around this fact, the Complaint essentially concedes that GEO merely collected the Department of Health's request to inspect additional, secure areas of Delaney Hall, provided the form to ICE, and deferred to ICE's decision to both grant and deny access. *See* Compl. at 2–19 ¶¶ 54–58. The Department of Health later reached out to ICE, and spoke to a "federal official" on June 1, 2026, who advised "that [the Department of Health] would not be able to inspect any areas of the facility other than the food service areas it had already visited." *Id.* ¶ 64. These allegations are entirely consistent with GEO's own evidence, which confirms that on May 28, 2026, ICE granted Plaintiff permission to conduct an inspection of the kitchen at Delaney Hall. *See* Grimes Decl. ¶ 10 Ex. B. It was likewise ICE—and not GEO—that denied Plaintiff's access on May 29, 2026 to inspect several other areas of Delaney Hall. *See id.* ¶ 11 Ex. C.

ICE's control over access to Delaney Hall is also entirely consistent with the legal framework governing immigration detention in this country and the terms of the ICE Contract. Congress has expressly approved ICE's security protocol limiting

visits to secure immigration detention facilities.  In fact, Congress imposed only a small carve-out for its own members and staff but did not otherwise alter ICE's security mandate.  *See* FY2024 Appropriations Act, div. C, title V, Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024).

Moreover, the ICE Contract confirms that "ICE is responsible for the detention, health, welfare, transportation, and deportation of aliens in removal proceedings[.]" Ragsdale Decl. ¶ 5 (ICE Contract § 1.1).  It then outlines the specific procedures for all requests for access to Delaney Hall, unambiguously requiring that ICE provide pre-clearance approval for all visitors :

> **Pre-clearance approval from ICE/ERO is required for any person or entity to have access to ICE field staff, facilities and information, including any proposed law enforcement officer visits**. All requests must be submitted in accordance with the requirements found at www.ice.gov/leadership/ocr. At facilities that house detainees for both ICE and the U.S. Marshals Service, inquiries regarding each agencies detainees will be directed to agency responsible for the detainee.

> All requests by NGOs and other stakeholders (which include, but are not limited to, intergovernmental entities, state and local governmental agencies, and members of academia, for tours or visits (including combined tour-and-visits events) must be submitted in writing to the local ICE/ERO Field Office. Tour requests should not be directed to the federal facility.

> Any such requests received by the federal facility shall be forwarded to the Field Office for review. When deciding whether to approve or deny the request, the Field Office Director, or his or her designee, will take into consideration safety and security, and the availability of personnel to staff the tour or visit. All tour or visit participants will be expected to submit personal information required by applicable ICE policies, so the Field Office can perform background checks as necessary.

19

Ragsdale Decl. ¶ 5 (ICE Contract § 1.16.16) (emphasis added).

Multiple provisions of the ICE Contract reiterate the need for pre-clearance approval from ICE—not GEO. *See, e.g.*, Ragsdale Decl. ¶ 5 (ICE Contract § 1.15:8) (stating that all visitations and tours to Delaney Hall "shall be conducted in accordance with the relevant provisions of NDS 2026 or as directed by ICE."); *id.* (ICE Contract § 1.16.1) (stating that "GEO "shall comply with ICE security plans"); *id.* (requiring GEO to "detect and detain persons attempting to gain unauthorized access"); *id.* (noting that ICE "exercise[s] full control over granting, denying, withholding or terminating unescorted government facility . . . access for [GEO] applicants/employees," subject to ICE's screening procedures); *see also, e.g.*, *id.* (ICE Contract § 1.2) ("Detention standards shall be performed in accordance with the most current version of the ICE National Detention Standards (NDS) 2026.").[3]

Critically, and consistent with this legal framework, requests to access Delaney Hall must be approved from ICE—and always have been. Grimes Decl. ¶ 12. As recently as June 8, 2026, Governor Sherrill was granted access to Delaney Hall through ICE—*not* GEO. Still the State opted to sue only GEO in this lawsuit.

Put simply: ICE controls access to Delaney Hall as a matter of law, as a matter of contract, and a matter of undisputed fact. As a result, Plaintiff lacks Article III

---

[3] The governing NDS 2026, which will be made publicly available shortly, confirms the principles expressed in the ICE Contract—namely, ICE controls access to facilities like Delaney Hall.

standing to sue because its purported injury is neither traceable to GEO nor is it redressable by any injunction against GEO.  The Court is without subject matter jurisdiction to even hear this motion for emergency relief.  *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (plaintiffs lacked standing for injunctive relief in part because an injunction against defendants would not redress censorship injuries where social media platforms were nonparties not bound by an injunction); *Reading v. N. Hanover*, 124 F.4th 189, 199 (3d Cir. 2024) (plaintiff lacked standing to seek a preliminary injunction and thus not reaching the traditional elements for preliminary injunctive relief); *Kurelko v. Att'y Gen.*, No. 25cv2041 (ZNQ (JBD), 2025 WL 2237495, at *2–3 (D.N.J. Aug. 6, 2025) (denying motion for injunctive relief because plaintiff failed to satisfy the "antecedent question" of Article III standing); *Lependorf v. Sup. Ct.*, No. 25cv2154 (RK) (TJB), 2026 WL 251893, at *8 (D.N.J. Jan. 30, 2026) (dismissing injunctive relief claims on Article III standing before reaching the traditional elements for preliminary injunctive relief); *Short v. N.J. Dep't of Educ.*, No. 23cv21105 (ESK) (EAP), 2025 WL 984730, at *5–13 (D.N.J. Mar. 28, 2025) (dismissing claims for injunctive relief for lack of standing).

**B.    There Is No Likelihood Of Success On The Merits**

**1.    There is no likelihood of success because the Complaint is subject to dismissal pursuant to Rule 12(b)(7) and Rule 19**

It is black-letter law that there is no likelihood of success on the merits if a Complaint is subject to dismissal or repleading pursuant to a Rule 12 motion.  *See*

21

*Autobar v. Berg Liquor*, No. 23cv3790 (MAS) (JBD), 2024 WL 919183, at \*5 n.9 (D.N.J. Mar. 4, 2024); *see also, e.g.*, *Doe v. Christie*, 33 F. Supp. 3d 518, 522 n.3 (D.N.J. 2014) (holding that if a plaintiff's claims "cannot survive . . . [a] motion[] to dismiss, [the plaintiff] would necessarily be unable to make a showing of likelihood of success on the merits in support of their preliminary injunction"), *aff'd sub nom. Doe v. Governor of N.J.*, 783 F.3d 150 (3d Cir. 2015).  Here, for the reasons stated in GEO's separately-filed motion for dismissal, ICE must be joined as a necessary party and the Complaint must be dismissed with prejudice pursuant to Rule 12(b)(7) and Rule 19.

Plaintiff cannot demonstrate a likelihood of success on the merits because, as explained in more detail in its motion for dismissal, its entire Complaint is subject to dismissal under Rule 19(a)(1)(A) & (B) on the grounds that it failed to join ICE as a necessary and indispensable party.  Accordingly, any motion for preliminary injunctive relief is fatally premature until Plaintiff joins ICE.  *See, e.g.*, *Sorenson v. Selective Serv. Sys.*, 203 F. Supp. 786, 793 (E.D. Pa. 1962) (dismissing complaint and refusing to pass on question of injunctive relief where "defendants whose actions are sought to be challenged are, in literal fact, indispensable to any consideration of the question" before Court in complaint but were not joined as parties to action).

ICE must be joined as a necessary and indispensable party because it is undisputed that the relief Plaintiff seeks through this action—namely, access to Delaney Hall in order to conduct inspections—can only be authorized by ICE.  *See*

22

Fed. R. Civ. P. 12(b)(7); 19(a)(1)(A)–(B); *see, e.g.*, *Tarek Holdings, LLC v. Shockley*, No. 21-20581(SDW)(AME), 2022 WL 13848153, at \*5 (D.N.J. Oct. 24, 2022) (complaint subject to dismissal under Rule 12(b)(7) because complete relief was not possible without absent party and their joinder would have destroyed diversity jurisdiction); *Rosenzweig v. Brunswick Corp.*, No. 08–807 (SDW), 2008 WL 3895485, at \*10 (D.N.J. Aug. 20, 2008) (complaint subject to dismissal under Rule 12(b)(7) because complete relief was not possible without absent party and contract required adjudication of claims in Connecticut).  And as the indisputable evidence demonstrates, ICE has both granted in part and denied in part Plaintiff's request to inspect secure areas of Delaney Hall.

Furthermore, ICE holds material and dominant federal interests in the regulation of immigration, and therefore must be included in these proceedings.  6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4); 8 U.S.C. § 1226(e).  Proceeding in this case without ICE to represent and address these dominant federal interests with foreign policy implications would undoubtably impair and impede those interests. *Arizona v. United States*, 567 U.S. 387, 394–95 (2012) ("[F]oreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."); *Hines*, 312 U.S. at 64–66, 73 (characterizing "the treatment of aliens, in whatever state they may be located" as "a *matter of national moment*") (emphasis added).

23

Because joinder of ICE is necessary before any emergency preliminary relief is granted, the Court should deny Plaintiff's motion. *See Ram v. Lal*, 906 F. Supp. 2d 59, 79 (E.D.N.Y. 2012) ("[T]he Court finds that the State Court and the Receiver are necessary parties to the action and must be before this Court in order to effectuate the requested injunction."); *Westchester Disabled On the Move, Inc. v. County of Westchester*, 346 F. Supp. 2d 473, 479–80 (S.D.N.Y. 2004) (denying motion for a preliminary injunction because where "[t]he currently named [d]efendants could not provide complete relief sought by [p]laintiffs . . . [the p]laintiffs cannot establish a likelihood of success on the merits"); *Boat Basin Invs., LLC v. First Am. Stock Transfer, Inc.*, No. 03cv493 (RWS), 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003) ("In the absence of . . . a necessary party under Rule 19(a) of the Federal Rules of Civil Procedure, the merits may not be reached and a preliminary injunction may not be granted."); *see also Bhd. of R. R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 523–24 (1947) (reversing denial of motion to intervene for purpose of moving to dismiss and challenging preliminary injunction entered in absence of indispensable party).

### 2.    There is no likelihood of success because GEO is immune

Second, there is no likelihood of success on the merits because GEO—as a private contractor to ICE—is immune under the doctrines of *Yearsley* defense (formerly derivative sovereign immunity) and intergovernmental immunity.

24

### a.    GEO is immune under *Yearsley*

The State is also unlikely to succeed on the merits of its claims because GEO acted under ICE's lawful authorization and according to ICE's terms.  To the extent Plaintiff contends that GEO may be enjoined because it cooperated with ICE's decisions both to grant and deny access to secure areas of Delaney Hall, *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), is a complete defense.

*Yearsley* protects a contractor who has "received a lawful authorization and acted according to its terms—meaning, when the contractor has acted within legal bounds."  *GEO Grp., Inc. v. Menocal*, 607 U.S. ---, 146 S. Ct. 774, 784 (2026); *Hencely v. Fluor*, 608 U.S. ---, 146 S. Ct. 1086, 1099 (2026).  Contractors fall outside *Yearsley* protection only where they either acted under an illegal authorization or exceeded the scope of a valid one.  *Menocal*, 146 S. Ct. at 784.  Plaintiff cannot show a likelihood of success on the merits in the face of *Yearsley*.

GEO satisfies the *Yearsley* requirements.  First, ICE has lawful authorization to both grant and deny access to its federal immigration detention facilities like Delaney Hall.  In assessing this element, courts ask whether "the Government's authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) (internal quotation marks & citation omitted).  Maintaining security over a federal immigration detention facility is within the constitutional power of Congress.  *See* U.S. Const. art. I, § 8, Cl. 4.  Congress delegated that

authority when it directed DHS to arrange for appropriate places of detention, including through contracts with private entities, 8 U.S.C. § 1231(g)(1); *see also* 28 U.S.C. § 530C(a)(4).  In fact, Congress only withheld a very narrow exception to ICE's authority to require notice or pre-approval for visits to the secure portions of detention facilities.  *See* FY2024 Appropriations Act,138 Stat. at 619 (exceptions for members of Congress and staff).  That exception does not apply here.

Second, by conveying ICE's decision to grant in part and deny in part Plaintiff's request to access Delaney Hall in this case, GEO acted according to ICE's specific direction.  *See* Grimes Decl. ¶¶ 10–11, Exs. B-C.

GEO's deferring of the access decision to ICE is protected by *Yearsley* because an injunction would punish GEO "precisely for accomplishing what the Federal Government requested."  *Hencely*, 146 S. Ct. at 1099.  Plaintiff, thus, cannot show the likelihood of success on its claim required for a preliminary injunction.

### b.     GEO is immune under the doctrine of intergovernmental immunity

#### (1)     Intergovernmental immunity—direct regulation

The Supremacy Clause provides that the "Laws of the United States" made in pursuance of the Constitution "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  In *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the Supreme Court recognized that this guarantee of federal supremacy would be meaningless if the federal government were not immune from regulation and taxation by the states.

26

The Supreme Court held that the supremacy of the federal government within its legitimate sphere of action necessarily meant that the states had no power to interfere with a constitutionally valid federal activity. *Id.* at 427–30. In line with *M'Culloch*'s prohibition on state laws that "retard, impede, burden, or in any manner control, the operations" of the federal government, *id*. at 436, a state law directly regulates the federal government—and is therefore unconstitutional—if it "involve[s] a direct, physical interference with federal activities ... or some direct, immediate burden on the performance of the [federal] functions." *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945) (citing cases). In assessing whether a state law substantially burdens federal operations, there is no distinction between state regulation of federal employees and state regulation of private contractors carrying out federal operations. In *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court declared that "the right of the State to control [a federal contractor's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained." *Id*. at 867 (Marshall, C.J.).

The Supreme Court has consistently relied on the Supremacy Clause to strike down state laws that dictate how the federal government carries out its functions. In *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down an Arkansas law that prevented a contractor selected by the federal government from bidding, contracting, and commencing work on a military base "without having obtained a license under Arkansas law for such activity." 352 U.S. 187, 188 (1956) (per curiam). The Court,

27

in rejecting the state law, reasoned that "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review" over the federal government's determination of who was qualified to perform federal work. *Id.* at 190.

Following this precedent, courts have held that intergovernmental immunity forbids a state from substantially interfering with federal activity carried out by a private contractor, even where the activity occurs on private land. *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). Plaintiff is likewise attempting to override ICE's authority to grant and deny access to Delaney Hall, in violation of the Intergovernmental Immunity Doctrine. *Cf. CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325–28 (3d Cir. 2025) (New Jersey law preventing ICE from contracting with private immigration detention facilities violated the Intergovernmental Immunity Doctrine).

Further, the requested relief directly regulates ICE because allowing Plaintiff access to secure areas of Delaney Hall over ICE's explicit denial would "dictate the manner in which the federal [immigration] function is carried out." *Id.* at 329 (alteration in original) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n.3 (1988)); *see also United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) (law directly regulates federal government where it dictates "the manner and conditions under which federal agents can enforce federal law"). As explained above, ICE has exclusive authority over access to Delaney Hall and has exercised

28

that authority in denying access here.  Plaintiff's request for unlimited, immediate access to Delaney Hall therefore is a "direct, physical interference" with ICE's security activities.  *Corsi*, 326 U.S. at 96; *see also Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 762 (9th Cir. 2025) (regimes that "dictat[e] the terms of a federal contract" directly regulate the federal government).

### (2)    Intergovernmental immunity—impermissible discrimination

The United States Supreme Court recently confirmed that the doctrine of Intergovernmental Immunity prohibits state laws that either "regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals."  *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (alterations in original) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)).  A state law impermissibly discriminates against the federal government or its contractors if it "single[s them] out" for less favorable "treatment," *Washington v. United States*, 460 U.S. 536, 546 (1983), or if it regulates them unfavorably on some basis related to their governmental "status," *North Dakota*, 495 U.S. at 438 (plurality opinion).  Preventing discrimination against the federal government or those with whom it deals lies at the heart of the Constitution's intergovernmental immunity doctrine.  *United States v. Washington*, 596 U.S. at 840.

Plaintiff's current attempts to override ICE's decision on access to the Delaney Hall Facility plainly represent a stark and unmistakable attempt to thwart

29

federal operations.    Further, the Complaint's recitation of purported health conditions are derived from a collection of media stories and statements from sitting senators with partisan political interests.    *See, e.g.*, Compl. at 10–11 ¶ 40 ("According to reports from United States Senator Andy Kim and Representative Rob Menendez"); ¶ 41 ("Senator Kim recounted"); ¶ 44 ("New Jersey Senators Kim and Cory Booker, along with eight of New Jersey congressional delegates, authored a letter").    But Plaintiff's reliance on these politically-motivated, dubious 'complaints' is undermined by its own May 28, 2026, inspection findings—which Plaintiff does not mention once in its Complaint or papers.    *Compare* Compl. at 10 ¶¶ 39–40 (recounting reports of "rotten" food "infested with worms), *with* Grimes Decl. ¶ 9 Ex. A (May 28, 2026 inspection of Delaney Hall found that "sanitation and physical condition of the production kitchen and warehousing areas were observed to be satisfactory and free from signs of rodent or vermin activity[.]").

Plaintiff's attempt to override ICE's decision on access to Delaney Hall is unconstitutional because it impermissibly discriminates against the federal government and its contractors.  *United States v. Washington*, 596 U.S. at 835–36.

### 3. There is no likelihood of success because federal immigration law preempts Plaintiff's attempt to enforce local health codes

Third, there is no likelihood of success because federal immigration law preempts Plaintiff's attempt to enforce local health codes in this case.

30

### a.    Field Preemption

Federal immigration law provides that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and "[w]hen United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the [Secretary] may expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g)(1). To effectively arrange for appropriate places of detention for removal of aliens, Congress further granted the Secretary authority "to make contracts ... as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties. *See also, e.g.*, 28 U.S.C. § 530C(a)(4); Pub. L. No. 106-553, § 119, 114 Stat. 2762A-52 (2000), codified at 18 U.S.C. § 4013 note; 18 U.S.C. § 4013.

Congress similarly granted the DHS Office of the Immigration Detention Ombudsman ("OIDO") sole authority to conduct inspections and investigations of complaints regarding conditions at federal immigration detention. *See* 6 U.S.C. § 205(b)(1) (assigning the OIDO with responsibility to create a "process to receive, investigate, resolve, and provide redress" for complaints concerning the "rights of individuals in immigration detention"); *see also* 6 U.S.C. § 205(b)(3) (granting OIDO authority to "[c]onduct unannounced inspections of detention facilities").

Congress also directed ICE to establish and implement national detention standards. As discussed above, NDS 2026 applies to the Delaney Hall federal contract. There is simply no requirement in NDS 2026—or anywhere else for that matter—that grants New Jersey unfettered access to conduct inspections. Rather, as contemplated by Congress, the OIDO has sole authority to conduct inspections through federal or authorized third-party inspectors. *See* 6 U.S.C. § 205(b)(1), (3).

On this point, *Leslie Miller*, 352 U.S. 187 and *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991) are instructive. In *Leslie Miller*, a contractor was prosecuted and fined by the state for working as a contractor without having obtained an Arkansas contractor's license. The fine was upheld by the Arkansas state courts. On appeal, the United States Supreme Court reversed. The Supreme Court found that the Arkansas statute requiring licensing of the contractor interfered with the federal government's power to select contractors and to schedule construction and, therefore, was in conflict with the federal law regulating procurement. *Id.* at 188. The Supreme Court went on to find the Arkansas state law requirements regarding contractor licensure were preempted because "similar grounds for licensing under the state statute and for finding 'responsibility'" are enumerated under the federal statute. *Id.* at 189–90. The Supreme Court further reasoned that application of such contractor licensing requirements to the federal government's preferred contractor would also "frustrate the expressed federal policy of selecting the lowest responsible bidder." *Id.*

In *Gartrell*, the Ninth Circuit found that a federal contract provision requiring contractor to obtain "necessary" licenses and comply with "applicable" state laws was nonetheless preempted by federal law.  940 F.2d at 438–40.  The Ninth Circuit reasoned that preemption precluded enforcement of state laws requiring contractor licenses because enforcement of such state laws would effectively supplant the federal government's "responsibility" determination for its selected federal contractor under 48 C.F.R. § 9.104-1, which requires prospective contractors to have adequate financial resources, to be able to comply with the performance schedule, and to have a satisfactory record of integrity and business ethics.  *Id.* at 439–40.

So, too, here. The comprehensive framework enacted by Congress regarding the detention of aliens for removal leads to the conclusion that the federal government has occupied the field—and that attempts to regulate such contractors by state governments frustrate and conflict with the federal government's interests in the regulation of immigration.

Field preemption is separately applicable because of the dominant interests of the federal government over immigration.  State law is preempted when it operates in a field "of federal regulation . . . so pervasive . . . that Congress left no room for the States to supplement it" or "in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Arizona*, 567 U.S. at 399.  It is well-settled that immigration is an area in which federal interests often dominate.

33

*Id.* at 395 ("[F]oreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."); *Hines*, 312 U.S. at 64–68 (explaining that immigration is a field that "demand[s] broad national authority"). The field is, therefore, preempted both because of the comprehensive federal immigration framework and the dominant federal interests over immigration.

Where Congress occupies an entire field, as it has in the field of alien detention pending removal, even complementary state regulation is impermissible. Accordingly, Plaintiff's attempts to enter the Delaney Hall Facility to conduct inspections without obtaining the proper permissions from ICE are unconstitutional.

### b.    Obstacle Preemption

As early as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), Chief Justice Marshall stated the governing principle—that "acts of the State Legislatures . . . [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause. *Id.* at 211. More than 100 years later, Justice Black wrote in a similar vein that the "primary function is to determine whether [a challenged state statute] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67 (footnotes omitted). Under this doctrine, "state laws are preempted when they conflict with federal law." *United States v. California*, 921 F.3d 865, 878–79 (9th Cir. 2019) (quoting *Arizona I*, 567 U.S. at 399). This includes

34

cases where "compliance with both federal and state regulations is a physical impossibility" and those instances where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 879 (quoting *Arizona I*, 567 U.S. at 399) (internal quotation marks omitted); *Murphy v. NCAA*, 584 U.S. 453, 471–72 (2018).

Allowing Plaintiff to exercise a virtual unlimited power of review over ICE's decisions regarding access to Delaney Hall through the discriminatory application of local codes stands as an impermissible obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

## C.  There Is No Irreparable Harm

"Demonstrating irreparable harm is perhaps the single most important prerequisite for issuing a preliminary injunction." *Tanko v. Moore*, 2023 WL 3033573, at \*2 (D.N.J. Apr. 21, 2023).  Plaintiff does not come close in this case.

First, as set forth repeatedly and at length above, it is undisputed that ICE— not GEO—controls access to the Facility, including Plaintiff's attempts to access Delaney Hall in this very case. *See, e.g.*, 6 U.S.C. § 205(b)(1), (3), *supra* at pp. 6–9, 13–14.  Accordingly, there is no irreparable harm because the issue about which Plaintiff complains is both immediately reparable—simply engage with ICE if Plaintiff wants access to conduct inspections—and self-inflicted, in that Plaintiff has improperly sought relief in this lawsuit from GEO, a party that does not control inspection access to the facility. *See, e.g.*, *Messina v. Coll. of N.J.*, 566 F. Supp. 3d

35

236, 249 (D.N.J. 2021) (finding that plaintiffs faced no irreparable harm because they had the option to avoid the alleged loss, but declined to take it); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.") (citing 11A Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed. 1995)).

Second, and entirely separately, the underlying basis for the alleged harm—the need to conduct inspections based on what amounts to mostly hearsay political reporting—also fails to demonstrate irreparable harm. Plaintiff accompanied its motion for emergency relief with one declaration from a Department of Health official that explicitly concedes under oath that there has been no actual inspection of the areas of Delaney Hall that Plaintiff contends "pose serious harm to the health and safety of detainees[.]" Compl., Ex. A ("Sahu Cert.") ¶¶ 46–62; Brief at p. 3. In other words: there is no foundation to support the so-called violations of health law. *See* N.J.S.A. 26:1A-16 & -18. As a result—and unsurprisingly given these admissions—the alleged violations identified in the declarations are a collection of hearsay statements from left-wing media and politicians. *See, e.g.*, Compl. at 9–10 ¶ 39 ("USA Today reported that detainees held in Delaney Hall . . . [were] being fed food that is rotten, spoiled, or infested with worms[.]"); ¶ 40 ("According to reports from United States Senator Andy Kim and Representative Rob Menendez . . . detainees reported being served rotten food"); ¶ 41 ("Senator Kim recounted meetings with detainees"); ¶ 44 ("New Jersey Senators Kim and Cory Booker, along

36

with eight of New Jersey congressional delegates, authored a letter" expressing various concerns, including about "the poor quality of food"). Telling, Plaintiff does not inform the Court of the results of its May 28, 2026, inspection of Delaney Hall's kitchen, which found conditions to be satisfactory and suggest that perhaps these hearsay reports are unfounded and made with ulterior motives. *Compare* Compl. at 9 ¶¶ 39–40 (recounting reports of "rotten" food "infested with worms), *with* Grimes Decl. ¶ 9 Ex. A (May 28, 2026 inspection of Delaney Hall found that "sanitation and physical condition of the production kitchen and warehousing areas were observed to be satisfactory and free from signs of rodent or vermin activity[.]"). Plaintiff also contends it received a recent report pertaining to tuberculosis. Brief at pp. 7, 13. But Plaintiff presents no evidence the detainee got tuberculosis at Delaney Hall, nor does Plaintiff present evidence that Delaney Hall's infection control procedures are deficient—to the contrary, the evidence shows that the detainee was transferred to University Hospital for treatment. *See* Sahu Cert. at 58 ¶ 52. In sum, these purported harms—of dubious health violations for failed inspections that have not only yet to occur but are also contradicted by the one inspection that has taken place—are too remote and speculative to warrant emergency and preliminary injunctive relief. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("[T]he risk of irreparable harm must not be speculative[.]").

Accordingly, there is no irreparable harm here. Plaintiff can remedy any purported injury by requesting access from (or suing) ICE to provide access; instead,

37

it sued GEO, which cannot provide access over ICE's denial.  Further, the inspection that ICE authorized resulted in a "satisfactory" assessment, undermining the inflammatory allegations Plaintiff alleges about food service at the federal facility. Any other requested relief based on hearsay and politicized accusations of health and safety violations of areas Plaintiff has not yet conducted is speculative and putting the cart before the horse.

**D.    Granting A Preliminary Injunction Will Result In Harm To GEO And Will Not Serve The Public Interest In Enforcing Immigration Laws**

Only if the Court concludes that Plaintiff has shown likelihood of success on the merits and irreparable harm—and for the reasons just stated, it has not—the Court may also consider two additional factors:  (1) "the possibility of harm to other interested persons from the grant or denial of the injunction," and (2) "the public interest."  *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 920 (3d Cir. 1974); *see also, e.g.*, *Reilly*, 858 F.3d at 176 (reiterating this standard); *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 399 (D.N.J. 1989) ("In considering any motion for preliminary injunctive relief, a court should consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it.").

It is undisputed that granting the requested relief to subject Delaney Hall to State access and inspections over ICE's denial would harm the public's significant interest in enforcing this country's immigration laws.  On March 15, 2025, Congress

38

passed—and President Trump signed into law—a continuing resolution that significantly increased funding to support "U.S. Immigration and Customs Enforcement—Operations and Support." FY2025 Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9, 27 (March 15, 2025). President Trump has likewise consistently announced that immigration enforcement is a top priority for the federal government. *See* President Donald J. Trump, *Protecting the American People Against Invasion* (Jan. 20, 2025), https://tinyurl.com/yauyxxks. Through these actions, among others, the federal government has announced an enhanced public policy interest in immigration enforcement, including through the funding of additional domestic immigration detention facilities required to support those enforcement efforts. *Id.* ("Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States."). As recently as June 9, 2026, Congress passed The Secure America Act, which funds ICE through fiscal year 2029.

Plaintiff has made its contrary intention crystal clear: it intends to thwart these national priorities through the admittedly selective enforcement of state laws. Governor Sherrill does not even pretend to hide this motive: she said she would "keep pushing to see Delaney Hall close," Nieto-Munoz, *Gov. Sherrill implements protest zones*, *supra*, and that she "do[es]n't think private detention centers should be operating in New Jersey" and that "[she'd] like to see it shut down." Devon Williams and Miniya Malone, *Sherrill calls for shutdown*, *supra*. It is not in the

39

public interest to prioritize local partisan politics over the country's overwhelming interest in the enforcement of this country's immigration laws.

## IV.   CONCLUSION

For the foregoing reasons, GEO respectfully requests that the Court deny Plaintiff's motion.

Dated: June 12, 2026                            DAVIS WRIGHT TREMAINE LLP

By: */s/ Geoffrey S. Brounell*
     Geoffrey S. Brounell

1251 Avenue of the Americas, 42nd Floor
New York, NY 10020-1104
geoffreybrounell@dwt.com

*Attorneys for The GEO Group, Inc.*

40